## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 20 2018, 7:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

J. Clayton Miller
Jordan Law, LLC
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of R.D., Minor Child, | December 20, 2018 |
| J.S., Mother, | Court of Appeals Case No. 18A-JT-1645 |
| *Appellant-Respondent*, | Appeal from the Randolph Circuit Court |
| v. | The Honorable Jay L. Toney, Judge |
| The Indiana Department of Child Services, | Trial Court Cause No. 68C01-1705-JT-114 |
| *Appellee-Petitioner*. | |

**Brown, Judge.**

[1] J.S. ("Mother") appeals the involuntary termination of her parental rights with respect to R.D.[1] We affirm.

## *Facts and Procedural History*

[2] On May 10, 2017, the Indiana Department of Child Services ("DCS") filed a petition for termination of Mother's parental rights as to R.D., who was born on August 24, 2003. On January 31, 2018, and March 8, 2018, the court held an evidentiary hearing.

[3] On June 18, 2018, the court entered an order terminating Mother's parental rights as to R.D. which provides in part:

> 5. Mother has a total of four (4) children, including [R.D.].
>
> 6. In March, 2014, Mother entered into a Program of Informal Adjustment with the Department of Child Services in Randolph County, hereinafter referred to as "RCDCS".
>
> 7. Mother and her children had contact with RCDCS after Mother's child, C.S., tested positive for opiates at birth on October 31, 2013.
>
> 8. During the Program of Informal Adjustment, [R.D.], C.S., and another sibling, B.D., were in Mother's care, custody and control.
>
> 9. During the Program of Informal Adjustment, Mother did not successfully complete a substance abuse treatment program.

---

[1] R.D.'s father signed a Consent to Adoption for R.D. and does not appeal the termination of his parental rights as to R.D.

10. Mother was a patient at the methadone Treatment Center during some, or all, of the period of the Program of Informal Adjustment.

11. Mother tested positive for heroin and Methadone on May 7, 2014.

12. Mother tested positive for heroin, cocaine and Methadone on May 21, 2014.

13. On May 28, 2014, RCDCS received a report that [R.D.] got off of the school bus and there was no adult to pick her up and take her home.

14. RCDCS Case Manager, Cassandra West (previously known as Cassandra Liss), addressed the report from May 28, 2014, and determined that Mother had not made arrangements for [R.D.] on that day.

15. Based on Mother's positive drug screens, the report regarding [R.D.] from May 28, 2014, and Mother's general non–compliance with the requirements of the Program of Informal Adjustment, RCDCS filed a Verified Petition Alleging Child in Need of Services as to each of the children in Mother's care.

16. [R.D.] is the subject of a Child in Need of Services, hereinafter referred to as "CHINS", case that was filed on June 3, 2014, under Cause No. 68C01-1405-JC-000083 [("Cause No. 83")], which cause remains an open case.

17. [R.D.] and her two (2) siblings were removed from Mother's care on or about June 2, 2014.

18. A Detention and Initial Hearing was held on June 5, 2014, in [Cause No. 83], and it was ordered that Juvenile should continue outside of Mother's care.

19. [R.D.] has remained outside of Mother's care since her initial removal.

20. Mother's two (2) other children that were removed at the same time as [R.D.], were never returned to Mother's care, as they were reunified with their father and their CHINS cases were subsequently closed.

21. Mother gave birth to a fourth child, S.S., on September 25, 2016, and S.S.'s cord blood tested positive for opiates and Methadone at birth.

22. S.S. was admitted to the Neonatal Intensive Care Unit after birth, where the child received treatment for withdrawal symptoms.

23. Mother tested positive for opiates and Methadone during her pregnancy with S.S.

24. Delaware County Department of Child Services filed a Verified Petition Alleging Child in Need of Services as to S.S., in November, 2016, under Cause No. 18C02-1611-JC-000335, which case remains an open case.

25. Under [Cause No. 83], [R.D.] was found to be a Child in Need of Services on June 30, 2014, after Mother's admission that Mother tested positive for heroin on May 7, 2014, and May 21, 2014, during which times Mother had one or more children in her care.

26. On August 4, 2014, an Order of Participation was filed in [Cause No. 83], in which Mother was ordered, among other things, to:

> a. Contact the FCM on a weekly basis via phone call, text message or letter.
>
> b. Notify the FCM of any changes to household composition within five (5) days of the change.
>
> c. Notify the FCM of any arrests or criminal charges within five (5) days.

> d. Keep all appointments with service providers.
>
> e. Sign any releases needed to monitor compliance with Court orders.
>
> f. Maintain suitable, safe and stable housing.
>
> g. Not use, consume, manufacture, trade, distribute, or sell any illegal controlled substances, and will [sic] only take prescription medications for which a valid and current prescription exists.

27. The permanency plan for [R.D.], in [Cause No. 83], began as Reunification.

28. RCDCS Case Manager West was working with Mother toward reunification and testified that Mother progressed ruing [sic] the Fall of 2014 and continuing into the Summer of 2015.

29. During the period of Mother's progress, restrictions upon Mother's visitation with [R.D.] were lifted and by June, 2015, RCDCS was granted authority to allow unsupervised visitation between Mother and [R.D.] to further the goal of reunification with Mother.

30. On or about June 1, 2015, a Permanency Hearing was held, in [Cause No. 83] and a permanency plan of Reunification was ordered.

31. On October 2, 2015, an Order Modifying Dispositional Decree and Modifying Visitation was filed in [Cause No. 83], granting RCDCS' request, after RCDCS requested that Mother's visitation return to being supervised as Mother had failed to submit to several drug screens when requested by DCS, and was consistently late in arriving for visits with [R.D.].

32. A Review Hearing was held on October 26, 2015, in [Cause No. 83], and Mother's visitations were ordered to remain supervised.

33. A Review Hearing was held on February 1, 2016, in [Cause No. 83], and [R.D.] was ordered to continue in out-of-home placement, and Mother's visitations were ordered to remain supervised.

34. A Permanency Hearing was held on April 26, 2016, in [Cause No. 83], and Mother failed to appear. The permanency plan was changed from reunification to guardianship.

35. Between the Review Hearing held October 26, 2015, in [Cause No. 83], and the Permanency Hearing held April 26, 2016, Mother's level of participation in services and visitation decreased.

36. In April, 2016, RCDCS reported that Mother had stopped contacting RCDCS on a regular basis.

37. During 2016, there were several months in which RCDCS Case Manager West was not aware of Mother's whereabouts, that Mother did not visit [R.D.], and did not submit to drug screens for RCDCS Case Manager West.

38. When Mother re-connected with RCDCS Case Manager West, Mother was pregnant with S.S.

39. A Review Hearing was held on August 25, 2016, in [Cause No. 83]. Mother's visitation was ordered to remain supervised and Mother was again ordered to participate in drug treatment services and to cooperate with any drug screen requests.

40. A Review Hearing was held on December 15, 2016, in [Cause No. 83], and Mother failed to appear. The Court found that Mother had chosen not to visit with [R.D.] for three (3) weeks prior, and that Mother had minimal contact with RCDCS since the prior hearing. The permanency plan was changed to adoption.

41. A Review Hearing and a Permanency Hearing was held on March 30, 2017, and Mother failed to appear.

42. Mother failed to provide updated contact information to RCDCS for many months during 2017.

43. Efforts to effect service of the Petition in this cause was delayed due to Mother's failure to advise DCS of her whereabouts.

44. Mother testified that during the early months of 2017, she continued to use illegal substances and abuse prescription substances.

45. Mother testified that she went to Florida to live with her father in the late Spring or Summer of 2017, in order to detox.

46. Mother testified that she took morphine pills with her to Florida when she went to detox.

47. Mother testified that during her detox in Florida, she smoked marijuana and took Suboxone. Mother further testified that she had a prescription for the Suboxone from a doctor in Indiana, but also testified that she bought Suboxone "off the street".

48. RCDCS Case Manager Dawn Kunkler began working with [R.D.] in June, 2017, and at that time, RCDCS was not aware of Mother's whereabouts.

49. RCDCS Case Manager Kunkler made attempts to locate and contact Mother, including leaving voice and text messages on Mother's cell phone.

50. On August 25, 2017, RCDCS Case Manager Kunkler spoke with Mother and learned that Mother was in Florida.

51. During the time Mother was in Florida, Mother did not visit [R.D.], and Mother's services referred by RCDCS were all suspended due to Mother's lack of contact.

52. RCDCS Case Manager Kunkler first met Mother at a Court hearing, in [Cause No. 83], in December, 2017.

53. At the conclusion of evidence in this matter, Mother had not visited with [R.D.] for at least one (1) year.

54. Mother has never successfully completed a substance abuse treatment program, but did participate in a Methadone treatment program for a period [of] time during the pendency of [Cause No. 83].

55. During the period of time from June, 2014, through September, 2015, Mother submitted many drug screens which were only positive for Methadone, for which Mother did have a valid prescription.

56. During the period of time from October, 2016, through May, 2017, Mother submitted many drug screens which were positive for substances including Morphine, Fentanyl, Heroin, and Alprazolam (Xanax).

57. After May, 2017, Mother did not submit to any drug screens until sometime in early[] 2018, after Mother returned from Florida.

58. Since January, 2018, Mother has submitted two (2) positive drug screens, including one which was positive for Cocaine.

59. Mother has made little to no progress during the pendency of [Cause No. 83].

60. There is a reasonable probability that the conditions that resulted in [R.D.'s] removal and/or continued placement outside the home will not be remedied.

61. There is a reasonable probability that the continuation of the parent/child relationship poses a threat to the well-being of [R.D.].

62. Termination of the parent/child relationship is in the best interest of [R.D.].

63. The Department of Child Services has a satisfactory plan for the care and treatment of [R.D.], which includes Adoption.

Appellant's Appendix Volume II at 40-45.

## *Discussion*

[4] The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[5] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[6] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly

erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[7] Mother phrases the issue as and focuses her argument on whether DCS proved, by clear and convincing evidence, that termination is in the best interests of R.D. Mother does not specifically argue that the evidence does not support the trial court's determinations that there is a reasonable probability that the conditions that resulted in R.D.'s removal and/or continued placement outside the home will not be remedied and that there is a reasonable probability that the continuation of the parent/child relationship poses a threat to the well-being of R.D. To the extent Mother does not challenge the court's findings, these unchallenged facts stand as proven. *See In re Involuntary Termination of Parent-Child Relationship of B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*; *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when the father failed to challenge specific findings, this Court accepted them as true).

[8] Mother argues that the evidence does not support the court's best-interests determination and contends that the court wholly ignored or disregarded significant contact between Mother and R.D. Mother also asserts that her efforts to maintain her relationship with R.D. demonstrate she is an interested

and willing parent and contends that, even if this Court were to find a basis for the trial court's findings, the findings "fall far short of the high clear and convincing evidence burden" which DCS is required to meet. Appellant's Brief at 9. DCS maintains that the court's conclusion that termination is in R.D.'s best interests is not clearly erroneous.

[9] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648. The testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride*, 798 N.E.2d at 203. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing

evidence that termination is in the child's best interests.  *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[10] The record reveals that home- and school-based therapist Karen Poling testified that R.D. has been involved with DCS for nearly four years, that "with all of us being in her life for a really long time . . . she'd like to be a typical teenager," and that she would "like to go to school, she'd like to do sports and be involved in clubs, and . . . not have us in her life."  Transcript Volume II at 45.  When asked whether she had concerns if R.D. "stays in this system, or with DCS involvement, for . . . an indefinite period of time," Poling stated:

> I do.  I am concerned that – that this – this – that – that part of progress – regardless of whether she's gonna have feelings that she needs to share later about this process and about what happened, she needs to be finished, she needs to have a break, and then if those feeling[s] occur naturally, then that's great, if they don't, then she's not that type of person that is gonna need to talk about all the things that have happened.  And – but that's not gonna happen now, in this setting.

*Id.* at 46.  In response to being asked "[w]hy not," Poling indicated "[b]ecause she's so guarded and so resistant, because she wants us to be out of her life, that she won't participate in most cases."  *Id.*  Family Case Manager Kunkler testified that DCS's plan for R.D. was adoption and that it was in her best interests "[i]n regards to stability and permanency for this child, . . . and well-being.  She presents as happy there, I've observed it.  It's where she – where I believe that she wishes to – for home to be and it's . . . the most stable environment she's had the last four years."  *Id.* at 125.  Court Appointed

Special Advocate Andrea James ("CASA James") testified that her recommendation for the best interests of R.D. was adoption by R.D.'s relative caregivers, which would involve the termination of Mother's parental rights, and that R.D.

> would like to be adopted by [relative caregivers]. Um, she would like to be able to contact her mom, on her terms, and she asks that she not have visits with Mom right now, um, but says at some point, she would like it – to have visits with her, on her terms. When we talk about this, she usually mentions how she's very busy, um, with sports and school and friends, um, and that she doesn't, um, want that to interfere.

*Id.* at 141. In response to the question of whether she had an opinion on behalf of R.D. about "an impact on her if the case is . . . left to just linger indefinitely," CASA James stated:

> I do. Um, [R.D.], in the beginning, um, wouldn't say a whole lot. She was kind of quiet and laid back. Over the last year, she tends to voice, often now, that she's just tired of this. She doesn't like being pulled out of class. She doesn't like to feel different than the other kids in her grade. She wants to live a normal teenage life. Um, she tells us, often, that she wants us, me and the providers, she wants us gone. Um, she wants to be adopted and just wants this to be over with.

*Id.* at 141-142. When asked how R.D. was doing, she stated "Awesome. She's doing great. Um, she's getting wonderful grades, um, which has been a huge improvement for her." *Id.* at 136. CASA James Further stated that R.D. was involved in Student Council, sports, and 4-H. We observe further that the court

found, and Mother does not challenge, that Mother submitted many drug screens from October 2016 through May 2017 which were positive for substances including Morphine, Fentanyl, Heroin, and Alprazolam (Xanax) and that Mother has submitted two positive drug screens, including one which was positive for Cocaine, since January 2018.

[11] Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of the Child is supported by clear and convincing evidence. *See In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony of child advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

[12] We conclude that the trial court did not err in terminating the parental rights of Mother.

[13] Affirmed.

Bailey, J., and Bradford, J., concur.